## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| REBECCA RIKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-00571-TWP-DML |
| | ) | |
| BRUCE LEMMON, in his official capacity, | ) | |
| RICHARD BROWN, in his individual and | ) | |
| official capacity; JAMES BASINGER, in his | ) | |
| individual and official capacity, and JERRY | ) | |
| SNYDER, in his individual and official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' Motion for Summary Judgment (Filing No. 44). Plaintiff, Rebecca Riker ("Ms. Riker"), brought this action for alleged violations of her First Amendment right to association and to marry, and Fourteenth Amendment right to due process of law. Specifically, Ms. Riker alleges violations of her constitutional rights to visit with and marry an Indiana prisoner. She brings this action against Defendants Bruce Lemmon in his official capacity as the Commissioner of the Indiana Department of Correction, Richard Brown ("Superintendent Brown") in his individual and official capacities as the Superintendent of the Wabash Valley Correctional Facility, James Basinger ("Mr. Basinger") in his individual and official capacities as the Executive Director of Adult Facilities of the Indiana Department of Correction, and Jerry Snyder ("Mr. Snyder") in his individual and official capacities as Unit Team Manager/North of the Wabash Valley Correctional Facility. For the reasons discussed below, Defendants' Motion for Summary Judgment is **GRANTED.**

# I. BACKGROUND

## A.    Objections to Evidence

As an initial matter, the Court notes that Defendants have objected in several respects to Ms. Riker's Statement of Material Facts in Dispute. Specifically, they allege that the Statement includes unsupported statements, legal conclusions, facts in contrary to the evidence, or statements lacking personal knowledge. The Court agrees that such deficiencies exist and has not considered such "disputed facts" in deciding this motion.

## B.    Factual History

The following facts are considered undisputed and are viewed in the light most favorable to Ms. Riker, the nonmoving party. Paul Vest ("Mr. Vest") is an inmate at Wabash Valley Correctional Facility ("Wabash Valley"), a Level 4 maximum security facility. In 2006, Mr. Vest was convicted of Robbery (Serious Bodily Injury), a Class A Felony in violation of Indiana Code § 35-42-5-1, and was sentenced to fifty (50) years in prison. His projected release date is December 18, 2030.[1] Ms. Riker worked at Wabash Valley as an employee of ARAMARK Correctional Services, Inc. ("Aramark"), as a kitchen supervisor from December 2007 to April 2008. Aramark had a professional services contract with the Indiana Department of Correction ("IDOC") for the operation and management of food services for correctional facilities under the jurisdiction of the IDOC, which included Wabash Valley. Under the contract, Aramark was required to abide by all IDOC policies and procedures unless the contract specified otherwise. IDOC policies state that,

> Generally, ex-employees shall not be allowed to visit an offender who has been housed at the same facility during the time the ex-employee was employed there. . . . Unless the ex-employee and the offender are immediate family members or special circumstances exist, visits by ex-employees shall not be authorized until one (1) year after the employee's separation from the department.

---

[1] http://in.gov/apps/indcorrection/ofs/ofs (last visited July 29, 2014)

> Ex-employees shall not be permitted to visit an offender if the relationship between the offender and the ex-employee started or resulted from contact between the ex-employee and the offender during the ex-employee's period of employment with the Department.

Filing No. 44-11 at ECF p. 3. The policy further states that, "[i]f the decision is to deny the request to visit, the ex-employee may submit another request one (1) year from the date of the denial." Filing No. 44-11 at ECF p. 4. Finally, it states, "[i]n cases where an ex-employee has been terminated from employment or allowed to resign prior to termination, or during an investigation arising from a violation of department rules or procedures involving an offender . . . the ex-employee shall be denied visitation privileges permanently from all department facilities." Filing No. 44-11 at ECF p. 4.

As an employee of Aramark, Ms. Riker was trained by the IDOC at Wabash Valley. According to training documents which she signed, Ms. Riker received 40 hours of training on Department of Correction Emergency Security Procedures, including personal protection, security skills, and disciplinary policies. (See Filing No. 44-4.) Ms. Riker recalls only three days of training that included self-defense, handcuffs, and CPR techniques. Significantly, on December 31, 2007, Ms. Riker signed an acknowledgement for receipt of the Adult Disciplinary Policy, State Ethics Rules, and the handbook for Policy 04-03-103, "Information and Standards of Conduct for Departmental Staff" (Filing No. 44-4 at 6), which prohibits inappropriate contact with offenders, and forbids marriage, social relationships, physical contact beyond that which is required by job duties, and sexual contact which is a criminal offense under Indiana law.

Ms. Riker supervised approximately 20 inmates in the kitchen. She was responsible for checking out and checking in kitchen supplies and chemicals. She had keys to the kitchen and had access to a second kitchen area located in a dorm housing unit. Ms. Riker first met Mr. Vest while working in the kitchen as his supervisor. Mr. Vest and Ms. Riker engaged in a romantic

and physical relationship that began several months after Ms. Riker began working at Wabash Valley. The two kissed and had sexual intercourse in a walk-in cooler area down the hall from the kitchen on multiple occasions. *See* Filing No. 44-1 ECP p. 34-37. On April 7, 2008, co-worker Judy Payne ("Ms. Payne") witnessed Ms. Riker and Mr. Vest kissing. Ms. Payne informed Ms. Riker that she had reported Ms. Riker for kissing an inmate, and Ms. Riker left work that same day. Following this incident, Ms. Riker did not return to her employment with Aramark at Wabash Valley.

On May 28, 2008, Ms. Riker submitted a visitation application to Wabash Valley to be placed on Mr. Vest's list of visitors. Her application was denied with the note, "worked at this facility (Aramark) Dec 07-April 08." Filing No. 44-3 at ECF p. 2. She then wrote a letter to Commissioner Ed Buss, received on October 6, 2008, stating "I worked for the Wabash Valley Correctional Facility in Carlisle, IN. for a while, but I was employed by Aramark, a contractor" and requested that she be allowed to visit Mr. Vest. Filing No. 44-3 at ECF p. 3. On October 20, 2008, Southern Regional Director of Wabash Valley Stanley Knight ("Mr. Knight") responded to Ms. Riker's letter. He explained that the IDOC policy was clear that ex-employees are not allowed to visit offenders housed in the facility in which the ex-employee was employed. He further explained that the policy forbade visitation between an offender and ex-employee if the relationship was a product of contact between the ex-employee and offender during the period of employment. Filing No. 44-3 at ECF p. 4.

On March 4, 2009, Mr. Snyder responded to another letter from Ms. Riker who was again seeking visitation. He advised Ms. Riker of the above policy and denied her request for visitation. He further informed her of the appeal process. Filing No. 44-3 at ECF p. 5. Also in 2009, Mr. Vest requested to marry Ms. Riker through the prison's Religious Service Department.

The request was denied by the prison chaplain because Ms. Riker was not on Mr. Vest's approved visitation list. Filing No. 56-3. On February 6, 2011, Ms. Riker submitted another application to visit Mr. Vest, which was denied on April 18, 2011. She submitted two more applications on December 27, 2012, and January 5, 2013. Her January 5, 2013, application was denied with the note, "Denied—former employee—Aramark—Denied in 2009." Filing No. 44-3 at ECF p. 10. Ms. Riker never appealed any of the decisions to deny her visitation but instead continued to apply as she thought her application might one day be approved. Filing No. 56-2 at ECF p. 2. The instant action was filed on April 5, 2013.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged

factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III. DISCUSSION

Defendants raise several grounds for summary judgment, including that Ms. Riker's claims are barred by the statute of limitations and qualified immunity, and that the Defendants' actions did not violate Ms. Riker's constitutional rights. Ms. Riker's Complaint seeks damages, declaratory judgment, and injunctive relief, and it arises out of 42 U.S.C. § 1983 against the Defendants in their official and individual capacities. Section 1983 is not itself a source of substantive rights; instead, it is a means for vindicating federal rights conferred elsewhere. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). That said, the initial step in any § 1983 analysis is to identify the specific constitutional right which was allegedly violated. *Id.* at 394. Ms. Riker alleges her right to association, her right to marry, and her right to due process have been violated. Before examining the merits of Ms. Riker's claims, the Court must first address immunity and statute of limitations matters.

### A. Immunity

#### 1. Eleventh Amendment Immunity

Ms. Riker has sued each of the Defendants in their official capacities with the State of Indiana and seeks compensatory and punitive damages. "[T]he state is not a 'person' that can be sued in this way under 42 U.S.C. § 1983." *Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003). And while Ms. Riker has not sued the State of Indiana or even the IDOC, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit

against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). For this reason, the claims for damages against the Defendants in their official capacities fail.

However, Ms. Riker also seeks injunctive relief and asks the Court to award her visitation rights. Under the *Ex parte Young* doctrine, "a private party may sue individual state officials in federal court to obtain prospective relief for an ongoing violation of federal law." *MIC Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir. 2000). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1051 (7th Cir. 2013) (internal quotation marks omitted). Ms. Riker alleges her federal rights were violated when Defendants denied her visitation requests and she seeks a declaration that she be allowed to visit Mr. Vest. The Court finds that Ms. Riker's claims seek the type of prospective relief required by the *Ex parte Young* doctrine, therefore her claims for injunctive relief against the Defendants in their official capacities may proceed. However, to the extent Ms. Riker's claims arise under state law, the claims fail, because the exception applies only to ongoing violations of federal law.

### 2. Qualified Immunity

Ms. Riker also brings suit for damages against Superintendent Brown, Mr. Basinger, and Mr. Snyder in their individual capacities. "Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (internal

quotation omitted). Qualified immunity gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011). To overcome qualified immunity, a plaintiff must show both "(1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott*, 705 F.3d at 713. A right is clearly established where "the contours of the right are sufficiently clear that the reasonable official would understand that what he is doing violates that right." *Abbott*, 705 F.3d at 725 (quotation omitted). The right must be established "not as a broad proposition, but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (quotation and internal citation omitted). Plaintiffs can show either a "clearly analogous case establishing a right to be free from the specific conduct at issue" or "conduct [that] is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008). It is within the Court's discretion to grant immunity on the basis that the right was not clearly established without determining whether there was a violation in the first place. *Id*; *see Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

Defendants raised the issue of qualified immunity in their motion for summary judgment. As noted above, it is the plaintiff's burden to show that the doctrine does not apply by establishing a clearly established constitutional right and violation of that right. *See, e.g.*, *Purvis v. Oest*, 614 F.3d 713, 718 (7th Cir. 2010) ("In a qualified-immunity setting, the plaintiff bears the burden of showing that the constitutional right allegedly violated was clearly established at the time of the challenged conduct."). Here, Ms. Riker's response to summary judgment fails on both prongs. Ms. Riker's response to this issue consists of a two-paragraph block quote of the

qualified immunity standard, but provides no argument or clearly analogous cases showing that her alleged rights were clearly established or that the violation was so egregious that a reasonable official would know the Defendants' actions violated clearly established rights. Rather, as will be discussed more fully below, the case law suggests that Defendants' actions have been found justified in clearly analogous cases. *See Keeney v. Heath*, 57 F.3d 579 (7th Cir. 1995); and unpublished opinion, *Bilka v. Farrey*, 447 Fed. App'x 742 (7th Cir. 2011). Therefore, the Court finds Ms. Riker has failed to meet her burden and Defendants are entitled to qualified immunity.

Accordingly, summary judgment is **GRANTED** on the claims for damages against Superintendent Brown, Mr. Basinger, and Mr. Snyder.

**B.      Statute of Limitations**

Defendants contend that the applicable two year statute of limitations bars Ms. Riker's claims. Claims brought under § 1983 are governed by the statute of limitations for personal injury actions in the state where the purported injury occurred. *See Behavioral Inst. of Ind., LLC v. Hobart City of Common Council*, 406 F.3d 926, 929 (7th Cir. 2005). In Indiana, the personal injury statute of limitations is two years. Ind. Code § 34-11-2-4. Thus, Defendants argue that the statute of limitations began to run for Ms. Riker at the latest on March 4, 2009, when the second of Ms. Riker's applications for visitation was denied. They argue that as of this date, Ms. Riker's injury was known. The parties analyze this issue under the law differentiating between discrete acts rising to claims or continuing violations. However, the Court finds such analysis unnecessary. The policy upon which Defendants rely as the basis for denying Ms. Riker's visitation applications states that "[i]f the decision is to deny the request to visit, the ex-employee may submit another request one (1) year from the date of the denial." Filing No. 44-11 at ECF p. 4. Given that multiple applications are contemplated by the IDOC's policy, the Court finds that

the statute of limitations on Ms. Riker's claims reset with her February 6, 2011, and December 27, 2012, applications.[2]  Because her complaint was filed within two years of December 27, 2012, the statute of limitations does not bar her claim.  Therefore, the Court will consider the merits of the remaining claims.

## C.     Claims

The Court will only analyze Ms. Riker's claims against the Defendants in their official capacities and for prospective relief.  As an initial matter, Ms. Riker contends that the cited IDOC policies did not apply to her as she was not a IDOC employee, nor was she "the contractor" named in the Aramark-IDOC contract. The Court rejects this contention. The undisputed facts show that Ms. Riker executed and acknowledged receipt of the State Ethics Rules, the IDOC's Information and Standards of Conduct for Departmental Staff, and the Adult Disciplinary Policy, as required for all employees, including contract employees of the IDOC. Further, the plain language of the Aramark-IDOC contract establishes that Ms. Riker, as an Aramark employee, is subject to the IDOC policies at issue.  Specifically, the contract states "The Contractor shall abide by all Department of Correction policies and procedures unless otherwise specified in this contract".  ([Filing No. 44-9 at 2](#).)

With that backdrop in mind, the Court will examine the specific claims.  Ms. Riker has brought three constitutional claims:  right of association under the First Amendment, right to marry under the First Amendment, and an unspecified due process claim under the Fourteenth Amendment.

### 1.     Counts I and II: Right of Association and Right to Marry

---

[2] Ms. Riker submitted a subsequent application on January 5, 2013, but because a year had not yet passed from her most recent denial on December 27, 2013, the Court does not rely on the January 5, 2013, date for statute of limitations purposes.

Ms. Riker brings two causes of action grounded in the First Amendment. Although the Complaint fails to allege facts specific to each cause of action, the Court can infer that Count I refers to Ms. Riker's right to associate with a prisoner, Mr. Vest. *See Montgomery v. Stefaniak*, 410 F.3d 933, 938 (7th Cir. 2005) (noting two distinct forms of free association, one of which is freedom of expressive association arising from "the First Amendment and ensures the right to associate for the purpose of engaging in activities protected by the First Amendment"). However, the complaint and summary judgment briefing fail to identify any expression protected by the First Amendment that has been limited by Defendants. The Supreme Court has stated that "[i]t is possible to find some kernel of expression in almost every activity a person undertakes— for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Given the complete absence of fact supporting Count I, Defendants' motion for summary judgment on this claim will be **GRANTED**.

Further, under Count II, Ms. Riker asserts her right to an intimate association with Mr. Vest (marriage) and she cites the First Amendment as the source of that right. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618–19 (1984) (recognizing that personal relationships, including marriage, should be protected from unwarranted state interference). However, the right to form an intimate relationship is analyzed "under the Due Process Clause as a liberty interest, rather than as a relationship formed for first amendment purpose." *Christenson v. Cnty. of Boone, Ill.*, 483 F.3d 454, 463 (7th Cir. 2007). As such, it is a fundamental right. *Id.* The right to an intimate association therefore is properly classified as a due process claim under the Fourteenth Amendment, which Ms. Riker has brought in Count III. As there is no First Amendment violation, Defendants' motion for summary judgment on this claim will be **GRANTED**.

### 2.    Count III:  Due Process

The Court notes that Ms. Riker's Complaint does not contain specific facts alleging the conduct that violates her due process rights, nor does she identify the fundamental right she alleges was violated.  However, the parties' briefing contemplates that Ms. Riker's complaint brings a due process claim for the violation of her fundamental right to marry, or intimate association.  Additionally, neither party identified the proper framework nor level of scrutiny the Court should apply in evaluating the due process claim.  As such, the Court will follow the analysis described in *Zablocki v. Redhail*, 434 U.S. 374 (1978), as applied by the Seventh Circuit in *Montgomery*, 410 F.3d at 938:  "if the challenged policy imposes a direct and substantial burden on an intimate relationship, it is subject to strict scrutiny; if the policy does not impose a direct and substantial burden, it is subject only to rational basis review."

In *Keeney*, 57 F.3d at 580, the Seventh Circuit was faced with similar facts.  The plaintiff, a prison guard, became romantically involved with one of the prisoners with whom she became acquainted on the job.  The prisoner was transferred to a different prison and the plaintiff began visiting him.  She eventually informed her employer that she planned to marry the prisoner.  Because of the policy that prohibited prison employees from becoming socially involved with inmates, the plaintiff was told she could marry the prisoner or give up her job.  She resigned and married the prisoner.  She later brought suit under § 1983 alleging that her employer violated her constitutional right to marry.  The Seventh Circuit first noted that:

> [j]udges should be cautious about disparaging disciplinary and security concerns expressed by the correctional authorities…. As long as the concerns expressed by correctional authorities are plausible, and the burden that a challenged regulation

12

of jail or prison security places on protected rights a light or moderate one, the courts should not interfere.

*Id.* at 581.  The court then considered the facts in light of that principle, and determined that the burden on plaintiff's right to marry was "light or at most moderate, not heavy."  *Id.*

Like in *Keeney*, the Court finds here that the burden on Ms. Riker's right to marry was not substantial or direct, but was light or at most moderate.  First, the Court notes that Ms. Riker has not made a formal request to marry Mr. Vest.  Although it appears Mr. Vest made a formal request that was denied, *see, e.g.*, Filing No. 56-3, Ms. Riker only mentioned her desire to marry Mr. Vest in her letters, *see, e.g.*, Filing No. 44-3 at ECF p. 3 ("We love one another and would like to get married.  Please help us to get visits."); Filing No. 44-3 at ECF p. 7 ("We would like to get married.").  Further, the denial letters Ms. Riker received do not mention marriage. Second, the burden on Ms. Riker's right to marry is not the type courts generally find to be substantial and direct.  The Sixth Circuit defines a direct and substantial burden as one "where a large portion of those affected by the rule are absolutely or largely prevented from marrying, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses."  *Akers v. McGinnis*, 352 F.3d 1030, 1040 (6th Cir. 2003).  This is in line with the result in *Keeney* and is applicable in Ms. Riker's case.  Ms. Riker has not been absolutely prevented from marrying a large portion of the eligible population of spouses.[3]  Rather, Ms. Riker is very capable of marrying a large portion of the eligible population, despite that she has been denied visitation with Mr. Vest.  Thus, the Court need only apply a rational basis standard of scrutiny to the IDOC policy at issue.

As in *Keeney*, Defendants contend that legitimate penological interests support the policy relied upon when denying Ms. Riker's visitation requests and implied marriage request.  Despite

---

[3] In fact, Ms. Riker has been married and divorced (presumably to a non-inmate) in the time frame during which she sought visitation with Mr. Vest.  *See* Filing No. 44-1 at ECF pp. 8–9.

Ms. Riker's objections to the contrary, she was trained in IDOC security protocols, procedure, and the facility layout. She passed through building security and additional secure points each day she worked, and was given keys to her immediate work area. Allowing Ms. Riker, and other former employees, to visit inmates is a legitimate security risk and the Court will not second guess the security concerns expressed by the correctional authorities. *See Keeney*, 57 F.3d at 581. Further, Defendants are correct to point out that Ms. Riker knowingly violated the rules against entering relationships and having sexual contact with an inmate within the prison facility. It is rational to consider this factor when denying her visitation. The IDOC policy at issue passes rational basis scrutiny, and summary judgment will be **GRANTED**.

## IV. CONCLUSION

Accordingly, Defendants are entitled to summary judgment on each of Ms. Riker's claims. The Motion for Summary Judgment (Filing No. 44) is **GRANTED**. Ms. Riker's Complaint is **DISMISSED**.

**SO ORDERED.**

Date: 07/30/2014 _____

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Daniel Gore
INDIANA ATTORNEY GENERAL
Daniel.Gore@atg.in.gov

Aimee M. Gong
LAW OFFICES OF LAWRENCE M. REUBEN
gong@reubenlaw.net

Lawrence M. Reuben
LAW OFFICES OF LAWRENCE M.REUBEN
reuben@reubenlaw.net

Caryn M. Nieman
OFFICE OF THE ATTORNEY GENERAL
caryn.nieman@atg.in.gov